IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JOHN TRELLE,

                    Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                 Defendant.

Civ. No. 10-15-AC

OPINION AND
ORDER

---

ACOSTA, Magistrate Judge:

    Claimant John Trelle ("Claimant") seeks judicial review of a final decision of the
Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance
Benefits ("DIB") under Title II of the Social Security Act ("SSA") and for Supplemental Security
Income ("SSI") disability benefits under Title XVI of the SSA. *See* 42 U.S.C. §§ 401-433 and

OPINION AND ORDER              1                  {KPR}

§§ 1381-83f (2010). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, the court affirms the decision of the ALJ.

## Procedural History

Claimant filed for DIB and SSI benefits on August 9, 2005, alleging a disability onset date of February 4, 2004. The claim was denied initially and on reconsideration. On May 15, 2007, a hearing was held before an Administrative Law Judge ("ALJ"), who issued a decision on October 26, 2007, finding Claimant not disabled. Claimant requested review of this decision on November 23, 2007. The Appeals Council denied this request, making the ALJ's decision the Commissioner's final decision. Claimant filed for review of the final decision in this court on January 6, 2010.

## Factual Background

On March 9, 2004, after Claimant sustained an injury at work, Dr. Gary Hansen, M.D. ("Dr. Hansen") diagnosed Claimant with nerve root compression in one of his vertebrae, the disc designated L5-S1. (Tr. 175.) Approximately two months later, on May 18, 2004, Claimant underwent surgery to remove the disc that was causing the compression. (Tr. 178.) The surgery was performed by Dr. Jeffrey A. Louie ("Dr. Louie"). The procedure was successful and Claimant reported, post-operation, that he no longer had leg pain. *Id.* Claimant was discharged the following day, at which time he reported a pain level of three out of ten, and the discharging nurse concluded that he could perform activities of daily living without assistance. (Tr. 209.)

On November 4, 2004, Claimant saw Dr. K. Clair Anderson, M.D. ("Dr. Anderson"). (Tr. 224.) Claimant reported significantly decreased leg pain since the surgery, but that continued back and buttock pain prevented him from returning to work. (Tr. 224-225.) Claimant stated that lifting,

bending, and reaching triggered his back pain and that he could lift nothing heavier than a gallon of milk. (Tr. 225.) He also reported that he had a feeling of numbness in his feet. (Tr. 224.) Dr. Anderson concluded that Claimant could not return to his previous position as a Certified Nursing Assistant ("CNA"), and could not perform outside of the "light to light-medium physical demand range." (Tr. 227.) Dr. Anderson stated, in conclusion:

> Absent any further treatment, in my opinion, the patient is medically stationary. The patient has marked limitation of motion and marked hamstring tightness. An aggressive exercise program, such as a work hardening program, could significantly improve the patient's flexibility and, in all likelihood, give him better control of his pain.

*Id.* The same day Susan Bottomley ("Bottomley"), an occupational therapist, performed a "Work Capacity Evaluation" and concluded that Claimant was capable of light to light-medium work and had potential to improve further. (Tr. 230.) Although he could not currently perform the duties of a CNA, Bottomley felt that Claimant may be able to do so in the future.

On January 3, 2005, Dr. Louie agreed with previous determinations that Claimant could not return to his work as a CNA, but "recommend[ed] vocational retraining perhaps as a lab tech." (Tr. 247.) The following month, Claimant was examined by Dr. Mark D. Peterson ("Dr. Peterson") at his request, and that of his insurance company. (Tr. 238.) Dr. Peterson recommended that Claimant get a post-operative MRI to determine if there were additional lesions on the lumbar spine. If the MRI revealed that there were not, it was Dr. Peterson's opinion that Claimant "[was] probably medically stationary and should undergo a Physical Capacities Evaluation for claim closure and be returned to work under the recommended activity levels." (Tr. 238A.) He also recommended "ongoing therapeutic exercises." *Id.* On March 28, 2005, Dr. Louie saw Claimant to review his condition for "significant changes." (Tr. 246.) He observed that Claimant's leg pain was resolved

by surgery, but that he still had back pain.  Dr. Louie noted that Claimant was "no[t] interested in a fusion" at the time.  *Id.*

On November 1, 2005, Claimant saw Dr. Mark Greenberg, M.D. ("Dr. Greenberg") about his back pain and underwent an MRI.  Dr. Greenberg read the MRI which revealed "[n]o reherniation or nerve root compression[,]" and recommended diagnostic injections.  (Tr. 350.)  On November 21, 2005, Dr. Mary Ann Westfall, M.D. ("Dr. Westfall"), evaluated Claimant's RFC.  Dr. Westfall found that Claimant could lift fifty pounds occasionally and twenty-five pounds frequently; Claimant could both stand/walk and sit for six hours total out of an eight hour work day; Claimant was not limited in his ability to push and pull; and Claimant had no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 387-391.)  Dr. Westfall concluded that, with respect to Claimant's back pain, the disc herniation had not recurred since his surgery.  She wrote that Claimant had previously been known to exaggerate his symptoms and refuse alcohol treatment.  (Tr. 392.)  Dr. Westfall noted that Claimant's reports as to his activities of daily living were inconsistent and not credible.  (Tr. 392.)  She cited Dr. Greenberg's conclusions and concurred, stating that Claimant "ha[d] begun self-limiting himself to the point of deconditioning."  (Tr. 393.)  On November 23, 2005, Claimant's psychiatric health was again reviewed by Dr. Anderson who concluded that Claimant's anxiety, depression, and substance abuse disorders were non-severe and that Claimant was not functionally limited by these conditions.  (Tr. 372-385.

Beginning in 2002, Claimant began to experience difficulty with his memory, blacking out, and shaking.   (Tr. 280, 286.)  Claimant was diagnosed with cavernoma, or "cavernous malformation[,]" which is "an abnormal cluster of capillaries and venules that periodically bleed and give rise to a . . . lesion in the brain or spinal cord."  *Johns Hopkins Medicine*,

http://www.hopkinsmedicine.org/neurology_neuro-surgery/conditions_main/old/cavernous_malformation.html, last visited May 17, 2011. Cavernomas typically manifest themselves with "seizures, headaches or with a large bleed." *Id.* On May 15, 2005, Claimant was seen by Dr. Jonathan Carlson ("Dr. Carlson") regarding his cavernoma, and underwent an MRI that confirmed the diagnosis. (Tr. 241.) Claimant reported no change in his symptoms and Dr. Carlson wrote that he was "for the most part asymptomatic." *Id.* Claimant was not interested in having surgery and a follow-up appointment was tentatively scheduled for one to two years in the future.

On an "Impairment Questionnaire" regarding his seizures, Advanced Registered Nurse Practitioner Jonathan Wolman ("Nurse Wolman") wrote that Claimant was not having seizures, but that his prognosis was nonetheless "[p]oor[,]" as his cavernoma was "possibly/probably causing multiple neurological deficits along with alcohol use and depression." (Tr. 341.) In conclusion, Nurse Wolman wrote, "Malformation in the brain will continue to affect this patient's language, visual, memory and possibly motor activities.  He is permanently disabled.  Alcohol use and depression may also be contributing to this." (Tr. 346.)

Dr. Jon Ermshar ("Dr. Ermshar") examined Claimant on August 24, 2005, at which time Claimant reported that he could not stand for more than five minutes, and that if he spent twenty minutes shopping, he would need to lie down for an hour to recover. (Tr. 335.) Dr. Ermshar referred him to Dr. Greenberg for a pain evaluation and recommended that Claimant walk daily and engage in weight lifting. (Tr. 336.)

In November 2005, Dr. Ermshar filled out a "Multiple Impairments Questionnaire," diagnosing Claimant with degenerative disc disease and giving a prognosis of fair or stable with a

likely need for ongoing care or surgery. Dr. Ermshar reviewed Claimant's lab reports and observed disc protrusion. (Tr. 355.) Dr. Ermshar stated that Claimant's pain was constant and limited him daily such that he could not sit or stand all day, but had get up and move around every twenty to thirty minutes for five minutes at a time. (Tr. 356.) He estimated that Claimant's pain level was three or four out of ten; his fatigue level was seven out of ten; and that Claimant could sit for four to five hours and stand for two hours in an eight hour day. (Tr. 357.) He noted that Claimant was moderately limited with respect to carrying only ten to twenty pounds and reaching up with his arms. (Tr. 358.) Dr. Ermshar stated that Claimant was not malingering and that he could handle full-time work and tolerate a high degree of stress, but that his symptoms would increase in a competitive work environment such that he would need unscheduled thirty-minute breaks daily and would be absent at least three days a month. *Id.*

Claimant filled out a "Disability Report Adult" on August 16, 2005. (Tr. 100.) He stated he had worked in the past, but not since he sustained the back injury in question, and that pain prevented him from returning to work, as did his doctor's orders. (Tr. 101.)

On an September 29, 2005, "Seizure Questionnaire," Claimant reported that he was not on medication for seizures; did not remember his last seizure; and had not had a seizure in the last three months. Claimant's wife reported that Claimant had only one seizure in three years. (Tr. 131.) Claimant also filled out a "Pain Questionnaire" wherein he reported constant, aching pain in his lower back that became worse with movement. (Tr. 126.) Claimant stated that he took ibuprofen three or four times a week; needed to rest every three hours; could walk 200 yards at a time; and was able to perform personal grooming tasks, though he generally could not perform household chores. (Tr. 127-128.)

OPINION AND ORDER                                    6                                    {KPR}

Claimant reported that he could engage in activities of daily living as follows: he bathed and performed other personal care sitting down; did dishes sitting in a chair; took short walks for five to ten minutes two times a day; exercised in a pool for forty-five minutes, two or three times a week; performed basic food preparation and ran an occasional errand; fed the cats, dusted, and watered plants; could not lift more than a gallon of milk or walk further than 150 yards; no longer painted or gardened; occasionally used a cane and an electrotherapy machine; and had difficulty sleeping. (Tr. 133-140.) Claimant's wife reported that Claimant could no longer engage in a number of basic activities including, dancing, doing household chores, walking around, major shopping, yard work, exercise, or painting. She also noted that he had difficulty sleeping, could walk for only twenty minutes at a time, and used a cane when his back was particularly bad. (Tr. 141-148.)

*Legal Standard*

This court must affirm the Commissioner's decision if it is based on proper legal standard and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Andrews*, 53 F.3d at 1039-40. The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews*, 53 F.3d at 1039. In determining a claimant's residual functional capacity ("RFC"), an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).

*Summary of the ALJ's Findings*

The ALJ engaged in the five-step "sequential evaluation" process when she evaluated Claimant's disability, as required. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

I.    Steps One and Two

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful activity since the onset of his alleged disability. (Tr. 39.) At Step Two, the ALJ determined that Claimant had the following severe impairments: low back pain status post laminectomy and mild degenerative disc disease of the cervical spine. (Tr. 39.) The ALJ also determined that Claimant had the following non-severe impairments: seizures, black outs, cavernoma, depression, and anxiety. (Tr. 39-41.) The ALJ's specific findings as to each impairment are detailed below.

A.    *Degenerative Disc Disease and Low Back Pain*

Claimant sustained an on-the-job back injury in February 2004. (Tr. 42.) He initially complained of nerve pain in his right leg and this pain was not relieved by physical therapy. An MRI revealed a protruding disc and nerve root compression. Claimant underwent spinal surgery, a

OPINION AND ORDER                                8                                  {KPR}

laminectomy, in May 2004. The surgery was performed by Dr. Louie. (Tr. 42.) As a result of the injury, Claimant was unable to return to his job as a CNA, but was looking for less demanding work in the same field. (Tr. 42.)

In September 2004, Dr. Louie reported that Claimant suffered from lower back pain, but that he enjoyed full motor strength in all extremities. However, Claimant still could not lift more than fifteen pounds and could not return to his CNA position. (Tr. 42.) When Claimant was independently evaluated in conjunction with his workers' compensation claim, in November 2004, he reported intermittent nerve pain in his leg, but that the pain had otherwise resolved. He also reported improvement with physical therapy. (Tr. 42.) Dr. Anderson reported that Claimant could not return to work as a CNA due to temporary lifting restrictions, but that he otherwise had "full motor strength" and his pain was managed with 400 to 600 milligrams of ibuprofen. (Tr. 42.) Also in November 2004, Claimant was evaluated by Bottomley, an occupational therapist, who prescribed light or medium work with "micro breaks" every thirty to sixty minutes. (Tr. 43.) She noted that Claimant could not perform work as a CNA without modifications.

In January 2005, Claimant again saw Dr. Louie who reported that Claimant was medically stationary, that Claimant's surgery-related symptoms had resolved, and any remaining pain was unrelated to the surgery. (Tr. 43.) In February 2005, Claimant told Dr. Peterson that the back surgery had resolved his nerve pain, but that he continued to suffer from lower back pain. Claimant also reported that his left leg gave out at times. Dr. Peterson reported that Claimant did not suffer "motor deficits in any of his extremities" and that his symptoms were managed with over-the-counter medications. (Tr. 43.) An MRI taken the following month revealed no new or recurring herniation in Claimant's spine. (Tr. 43.)

Dr. Ermshar evaluated Claimant repeatedly beginning in April 2004. He filled out two Multiple Impairments Worksheets in November 2005 and September 2006. The worksheets contain similar information. They both state that Claimant could lift twenty pounds occasionally and ten pounds frequently, and that Claimant's physical impairments would cause him to miss three or more work days per month. With regard to Claimant's ability to sit or stand for extended periods of time, the 2005 worksheet stated that he could sit four to five hours and walk for two hours in an eight hour day. The 2006 worksheet said that Claimant could "sit, stand, or walk [for two] hours in an [eight] hour workday." (Tr. 44.)

At Dr. Ermshar's request, Claimant was evaluated by Dr. Greenberg in November 2005. Claimant reported that he experienced occasional nerve pain on his left side, but that it was only a minor problem; he also reported a dull ache in his lower back, and rated the degree of pain as between three and six on a scale of ten. (Tr. 43.) Dr. Greenberg observed that Claimant had a normal range of motion, flexion, and strength, except for minor pain with a right side bend. He noted no evidence of additional injury to Claimant's back and recommended epidural shots to address his lower back pain. Claimant did not follow up with Dr. Greenberg. By July 2006, Claimant was still not on prescription medication for his pain.

With regard to Claimant's cervical spine, the ALJ noted that Claimant had "mild degenerative disc disease at C5-6 and C6-7" but that overall cervical alignment was normal. (Tr. 45.) Although Claimant had previously complained of some pain associated with his cervical spine, he "reported no symptomatology with his cervical spine and full range of motion was noted therein[,]" during his evaluation by Dr. Greenberg. (Tr. 45.)

OPINION AND ORDER                          10                          {KPR}

### B.    Seizures/Black Outs

According to his wife's testimony, Claimant "had experienced one seizure-like activity in the prior three years[,]" which is prior to the claimed disability onset date. (Tr. 39.) Nurse Wolman filled out a "Seizures Impairment Questionnaire" which stated that he had seen Claimant annually since 2002 and that "no specific seizures had been diagnosed." (Tr. 39-40.)

Claimant has also reported experiencing "black outs" and "loss of time" in several instances, all of which occurred prior to Claimant's alleged disability onset date.  In the course of one such episode, Claimant reported that "the police showed up at his home and charged him with [driving under the influence.]" (Tr. 40.) Disability Determination Services ("DDS"), a state agency, "found that [Claimant] had a long history of alcohol dependence with restricted insight that prevented him from recognizing the reported black outs and memory problems as a consequence of his addiction." (Tr. 40.)  Nurse Wolman noted that Claimant did not wish to be treated for depression or alcohol dependence, and Claimant "reported that he continued to drink despite" medical advice. (Tr. 40-41.) Furthermore, Claimant has not reported seizure or black-out episodes occurring subsequent to the alleged disability onset date.

The ALJ wrote that, in light of the record as a whole, Claimant's "one-time seizure-like activity and difficulties with memory or black outs were induced by extensive alcohol abuse, which stopped once his intake of alcohol was reduced." (Tr. 40.)

### C.    Cavernoma

Claimant was diagnosed with a cavernoma in 2003, after an episode involving vision loss and weakness on the left side.  (Tr. 40.)  At the time, the condition resolved quickly and the cavernoma was diagnosed as benign, "with no direct limitations to [Claimant's] functional

capacities." (Tr. 40.) In March 2005, Claimant was seen by Dr. Carlson, a neurologist, to follow up on his cavernoma diagnosis. (Tr. 40.) Since the prior appointment, Claimant had experienced disruptions in his visual field and had changed his prescription for his glasses at least three times in the intervening period. (Tr. 40.) Claimant was otherwise asymptomatic and an MRI revealed no change to the cavernoma and that no surgical intervention was called for. (Tr. 40.) Nurse Wolman opined that Claimant's cavernoma coupled with his alcohol abuse and depression led to his reported neurological problems. (Tr. 40.) The ALJ concluded that, overall, Claimant's cavernoma was benign, asymptomatic, and essentially unchanged since its initial diagnosis. (Tr. 41.)

D.    *Depression and Anxiety*

Claimant reported to DDS that he experienced depression and anxiety but did not suffer from functional limitations as a result. (Tr. 41.) His medical records from the Veterans Administration ("VA") indicate a long history of depression and anxiety, but one that has been controlled by medication. (Tr. 41.) In 2002, the VA records show that Claimant Global Assessment of Functioning score was assessed at 85, which suggests little to no symptomatology. (Tr. 41.) The records indicate that Claimant has refused mental health treatment in the past. *Id.*

II.    Step Three

At Step Three, the ALJ determined that Claimant's impairments did not meet or medically equal a listing as set forth in the regulations, specifically Listing 1.04, Disorders of the Spine. (Tr. 41.) The ALJ wrote: "the claimant's impairments, severe and nonsevere, singularly and in combination, are not accompanied by the findings specified for any impairment or combination of impairments included in any section of the Listings. No treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment." (Tr. 41.) The ALJ

elaborated on this finding later in the decision, stating both that surgical intervention had been successful and that the impairment was too short-lived to qualify for the listing.

III.    Claimant's RFC

The ALJ concluded that Claimant "has the RFC to lift 20 pounds occasionally and 10 pounds frequently. The claimant needs a minor break after sitting 30 to 60 minutes. The claimant needs a minor break after standing 30 minutes. The claimant is limited to occasional bending and twisting." (Tr. 42.) The ALJ defined a "minor break" as one lasting approximately one minute with the purpose of stretching and breaking up the "static postures" of standing and sitting for longer periods of time. (Tr. 41-42 n.1.)

IV.    Step Four

At Step Four, the ALJ concluded that Claimant could not perform past relevant work. (Tr. 46.)

V.    Step Five

At Step Five, the ALJ concluded that Claimant was capable of performing other work that exists in substantial numbers in the national economy. (Tr. 47.) The VE testified, in response to the ALJ's hypothetical, that Claimant was capable of acting as a mail clerk, an outside deliverer, and an office helper. Each of these jobs are available both regionally and nationally.

*Discussion*

Claimant asserts five grounds upon which the ALJ's decision should be reversed: (1) the ALJ's credibility determination was flawed; (2) the ALJ improperly disregarded the testimony of Dr. Ermshar and Nurse Wolman; (3) Claimant meets Listing 1.04; (4) Claimant's mental impairments are severe; and (5) the Vocational Expert's testimony was not based on all of Claimant's limitations.

For the reasons that follow, the court affirms the ALJ's decision.

I.    Claimant Credibility

Ninth Circuit precedent holds that, where there is an underlying impairment that may reasonably produce the alleged symptoms:

> [w]ithout affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of [her] pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.

*Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999) (internal citations omitted). Claimant argues that the ALJ failed to determine whether underlying impairments existed that would reasonably produce the claimed symptoms and that the ALJ's reasons for rejecting Claimant's testimony as not credible were neither clear nor convincing. The Commissioner responds that the existence of an underlying impairment is implicit in the credibility analysis and that the ALJ's reasons were clear and convincing.

The ALJ gave several reasons for questioning Claimant's credibility:  Claimant did not pursue a consistent medication regime, despite his claims of disabling pain; when he did, Claimant primarily used over-the-counter pain medication; Claimant failed to follow through on the treatment recommendations of medical professionals; Claimant told Dr. Ermshar that Dr. Louie told him to retire, though Dr. Louie actually recommended retraining, not retirement; Claimant's reports as to his cervical spine were inconsistent with the objective medical evidence; Claimant's reports to Dr. Greenberg were inconsistent with other reports in that he "reported no symptomatology with his cervical spine and full range of motion was noted therein[]"; Claimant's reported activities of daily living were inconsistent with medical evidence and with one another; and Claimant used

"embellished language" to describe his condition in starker terms that were warranted. (Tr. 45-46.)

The ALJ has thus given sufficient support for his credibility finding and the court will not disturb it.

II.    Medical Opinions

"There are three types of medical opinions in social security cases:  those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Commissioner Social Security Administration*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).  In general, the opinion of a treating physician is entitled to controlling weight if well-supported and consistent with underlying evidence: "[A]n ALJ may not reject treating physicians' opinions unless he 'makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Smolen v. Chater*, 80 F.3d 1273, 1285 (1996) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).  Where the opinion is uncontroverted, the ALJ must give clear and convincing reasons to reject the opinion of the treating physician. *Id.*

The conclusions of examining physicians are given greater weight than those of non-examining physicians. *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990).  Where the examining physician's opinion is not contradicted, "the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." *Lester*, 81 F.3d at 830 (quoting *Pitzer*, 908 F.2d at 506).  Where the opinion is contradicted, it may only be rejected for specific and legitimate reasons. *Id.* at 830-831.

A.    *Dr. Ermshar's Findings*

Claimant argues that the ALJ improperly discounted the testimony of Dr. Ermshar, a treating

physician.

### 1.    Claimant's Self-Reports

First, the ALJ found that Dr. Ermshar improperly relied on Claimant's self-reports, which were problematic because Claimant was not wholly credible. According to the ALJ, Dr. Ermshar merely parroted back Claimant's own report to Dr. Carlson that his back pain had reduced by fifty-percent since surgery. Claimant argues that self-reports are important diagnostic tools and reliance on such reports is not error.

The court agrees that self-reports have evidentiary value and may be relied upon, except to the extent that the claimant is properly deemed not credible. *See Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." (quoting *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (internal citation omitted)). Here, the ALJ found Claimant not credible and, as such, was justified in discounting Dr. Ermshar's findings that relied upon these reports.

### 2.    Failure to seek treatment

The ALJ may also conclude that failure to seek treatment commensurate with the stated level of impairment or pain undermines a claimant's credibility. *See Fair v. Bowen,* 885 F.2d 597, 604 (9th Cir. 1989) (concluding that a failure to seek treatment may inform an ALJ's credibility determination). Although, as Claimant points out, the level of treatment sought is not always commensurate with the degree of impairment, it may "cast doubt on the sincerity of the claimant's pain testimony." *Id.* at 603. Here, the ALJ noted Claimant's failure to follow up on Dr. Greenberg's recommendation and that he was not on prescription medication for allegedly debilitating pain. To

OPINION AND ORDER                    16                    {KPR}

the extent these factors informed the ALJ's credibility determination, it was not error.

### 3.    Conflict with Dr. Louie

The ALJ makes much of the fact that Claimant told Dr. Ermshar that Dr. Louie recommended he retire. He relies on a statement in Dr. Ermshar's report from August 24, 2005: "Dr. Loui[e] has advised him to retire." (Tr. 440.) The ALJ concluded that this was in conflict with Dr. Louie's actual treatment note which reads: "At this time he cannot return to work as a CNA. He thinks he can only lift 15 pounds, I therefore recommend independent physical capacities exam to determine his work capacity." (Tr. 248.) The ALJ further reasoned that Claimant's attempt to get vocational training is evidence that he understood Dr. Louie's conclusion and actively misrepresented it to Dr. Ermshar. Whether this is the only or best interpretation of this evidence is not a question for this court. It was a reasonable conclusion based on substantial evidence and, thus, committed to the judgment of the ALJ.

Claimant also argues that Dr. Louie, who concluded that Claimant could not perform his past work, was not asked to evaluate Claimant's general work capacity and that Claimant's desire to train for other work should not prejudice him in his disability claim if he is indeed unable to work. The court notes however that the ALJ's concern, here, was not with Dr. Louie's conclusion but rather with Claimant's representation of that conclusion to Dr. Ermshar. This interpretation was not unreasonable or contrary to substantial evidence in the record. The ALJ did not suggest that Claimant's desire to retrain was inconsistent with his claimed disability, and Claimant's argument on this point is misplaced.

### 4.    Conflict with Dr. Greenberg

The ALJ also found that Dr. Ermshar's findings conflicted with those of Dr. Greenberg, a

OPINION AND ORDER                                17                                    {KPR}

specialist to whom Dr. Ermshar referred Claimant.  Dr. Greenberg's report revealed that Claimant had a full range of motion, experienced only minor pain upon "sidebending," and relied exclusively on non-prescription medication for pain relief.  The record further reveals that Claimant failed to follow through with Dr. Greenberg's recommended epidural injections.  The ALJ concluded that this report conflicted with Dr. Ermshar's assessment and gave greater weight to Dr. Greenberg as he is both a specialist and performed a more comprehensive evaluation to arrive at his conclusions.  In particular, Dr. Greenberg's opinion undermined Dr. Ermshar's opinion that Claimant would miss three or more days of work per month as a result of his limitations.

Claimant contends that this was error.  The Commissioner countered that Dr. Greenberg is a specialist in the subject area and Dr. Greenberg's objective medical findings were in conflict with Dr. Ermshar's conclusory findings and, thus, the ALJ reasonably elevated Dr. Greenberg's conclusions above those of Dr. Ermshar.  Claimant argues further that Dr. Greenberg did not give an opinion on his work capacity and that the ALJ should not have inferred anything about Claimant's capacity from Dr. Greenberg's omission and, in doing so, improperly substituted lay opinion for that of an expert.

Because Dr. Ermshar's findings were in dispute, the ALJ needed only give specific and legitimate reasons to reject Dr. Ermshar's findings in favor of Dr. Greenberg's findings.  The ALJ considered Dr. Greenberg's report more reliable based on Dr. Greenberg's expertise and the manner in which he reached his conclusions.  In addition, Dr. Ermshar's findings were already otherwise undermined by his reliance on Claimant's self reports, which reports the ALJ deemed not fully credible.  Thus, the ALJ gave specific and legitimate reasons for assigning greater weight to Dr. Greenberg's findings. Furthermore, there is no indication that the ALJ inferred anything from Dr.

Greenberg's lack of findings regarding Claimant's vocational capabilities and Claimant provides no specific instances of such an inference. Accordingly, the court will not disturb the ALJ's conclusions with respect to the relative weight of Dr. Ermshar and Dr. Greenberg's opinions.

5.    Conflict with Treatment Notes

The ALJ gave Dr. Ermshar's questionnaires less weight because they conflicted with his own treatment notes wherein he recommended that Claimant walk and lift weights daily, but later opined that he would miss three days of work per month. Claimant argues that these findings are not inconsistent and that limited exercise may be consistent with the existence of a disability.

Although the ability to engage in limited exercise does not necessarily undermine an otherwise valid disability claim, it may weigh against just such a finding. Here, the ALJ determined that the exercise Dr. Ermshar recommended was at odds with his ultimate conclusions as to the degree of Claimant's impairment. The ALJ was permitted to reach this conclusion and, in light of numerous additional reasons given by the ALJ with respect to Dr. Ermshar, the conclusion does not constitute error.

The ALJ's determination as to Dr. Ermshar's consistency and the weight to be given his ultimate conclusions was supported by substantial record evidence and will not be disturbed by the court.

*B.    Nurse Wolman's Findings*

The ALJ gave no weight to Nurse Wolman's statement regarding Claimant's permanent disability "because the overall record fails to corroborate his conclusory statement." (Tr. 40.) The ALJ explained that "[t]he specialists that evaluated the claimant's cavernoma reported it was benign with no direct limitations to his functional capacities[,]" and that, according to the record, Claimant

has suffered only one seizure and that the other such occurrences, i.e., the blackouts and memory problems, were exacerbated by alcohol abuse. *Id.* The ALJ also noted that Nurse Wolman's conclusion as to Claimant's disability is "an opinion on an issue reserved to the Commissioner under Social Security Ruling 96-5p, and requires vocational expertise outside the purview of the claimant's nurse practitioner." *Id.*

Claimant argues that the ALJ erred in giving no weight to the findings of Nurse Wolman. According to Claimant, Nurse Wolman is an acceptable medical source who made findings about Claimant's work limitations based on Claimant's treatment records from the VA; these findings were based on objective evidence and were not contradicted. Claimant further argues Dr. Carlson's contradictory findings should not receive deference because they were based on a single examination and, further, it is not clear from the record if Dr. Carlson reviewed Claimant's other records prior to forming his own conclusion. Finally, Claimant argues that Nurse Wolman's conclusions should be given greater weight because he was part of a "treatment team" that included medical professionals. The Commissioner responds that the ALJ did not err in giving little to no weight to Nurse Wolman's conclusions because they were not corroborated by the record as a whole and were specifically contradicted by Dr. Carlson, a neurologist; as an "other source" Nurse Wolman is entitled to the same treatment as a lay witness; and Claimant's "treatment team" argument does not stand up to scrutiny.

The ALJ did not give weight to Nurse Wolman's ultimate conclusion that Claimant was permanently disabled by his neurological condition, possibly in conjunction with his alcohol use and depression. It is well established that, "[i]f the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915,

919 (9th Cir. 1993). It is appropriate to reject the testimony of a lay witness where it is inconsistent with medical evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

The court agrees that the record amply supports the ALJ's finding that Claimant was not disabled by his neurological condition and, thus, it was not error to disregard Nurse Wolman's conclusions to the contrary. As to whether Nurse Wolman should have been given the weight of a lay witness or a treating source, the distinction is immaterial in this case. Even if Nurse Wolman's conclusions were given the weight of those of a treating physician, the ALJ rejected those conclusions for clear and convincing reasons, the standard for rejecting such findings. The court will not disrupt this determination by the ALJ.

III.    Listing 1.04

Claimant argues that he meets the definition of Listing 1.04 and that the ALJ erred in his conclusory finding that Claimant did not meet the listing. The Commissioner argues that Claimant, having the burden to prove disability, has not met that burden with respect to Listing 1.04. Furthermore, the Commissioner contends, Claimant has ignored the ALJ's detailed treatment of this listing in the administrative ruling.

The ALJ first referenced Listing 1.04 in performing the five-step process and stated: "No treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment. Particular consideration is given to Listing 1.04 (disorders of the spine) in Appendix 1, Subpart P, Regulations Number 4." (Tr. 41.) The ALJ later explained his reasoning with respect to Listing 1.04. He wrote: "There is no evidence of record that indicates that the claimant had nerve root compression that was not resolved with the laminectomy completed in May 2004; there is no indication that it lasted the 12 months required under the Social Security Regulations." (Tr. 46.) In

other words, the surgical intervention was successful and the impairment was too short-lived to qualify for benefits under the law.

The court agrees that the ALJ gave sufficient analysis as to why the listing was not met. Further, the court agrees that the finding was consistent with substantial evidence in the record. The record reveals the following: Claimant underwent spinal surgery which resolved his leg pain, though he continued to suffer buttock and back pain; Dr. Anderson found Claimant to be medically stationary; Bottomley, an occupational therapist, concluded that Claimant could perform light to medium work; Dr. Greenberg performed a post-operative MRI which showed no reherniation or nerve compression; and Dr. Westfall agreed that reherniation had not occurred. Based on the record as a whole and the ALJ's legitimate credibility determinations, the ALJ's finding regarding Listing 1.04 was not in error.

IV.    Mental Impairments

As outlined above, the ALJ found that despite a long history of anxiety and depression, Claimant had successfully controlled his mental impairments with medication and had been assigned a GAF score indicating a high-degree of functionality. Claimant argues that his mental impairments were in fact severe and that, in conjunction with Claimant's other impairments, they caused him to be disabled under the law. Claimant cites evidence that he sought treatment for depression and was treated for it; that Nurse Wolman characterized it as a complicating factor in Claimant's impairment profile; and his own testimony that depression presented more than a de minimis limitation. The Commissioner responds that Claimant failed to establish that the impairment was severe from an evidentiary perspective and that the ALJ reasonably interpreted the evidence to find Claimant's mental impairments non-severe.

A severe impairment, for purposes of the disability determination, is an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c) (2011). The court agrees that based on the record evidence the ALJ did not err in concluding that Claimant's mental impairments were non-severe. The record evidence shows that, although Claimant has a history of depression and anxiety, his conditions have been adequately managed through medication and do not present a significant limitation of his ability to work.

## V.    Vocational Expert Testimony

Claimant argues that the ALJ's hypothetical as presented to the VE was incomplete as it did not include all of Claimant's limitations, namely that Claimant will miss three or more days of work per month. The Commissioner responds that the hypothetical was proper because it included all of the limitations that the ALJ found credible and supported by the evidentiary record, noting that the ALJ appropriately rejected the testimony of Dr. Ermshar and Nurse Wolman and, as such, the conclusion that Claimant would miss three or more days of work per month.

The court agrees that, based on the ALJ's legitimate decision not to credit that finding, it was not error for the ALJ to omit it from the hypothetical.

### Conclusion

For the reasons above stated, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED this 20th day of September, 2011.

_____
JOHN V. ACOSTA
United States Magistrate Judge

OPINION AND ORDER                    23                    {KPR}